## NICHLOS v. HANBURY-RUSSELL SUPPLY CO.

No. 22272.    May 15, 1934.

Rehearing Denied June 5, 1934.

Bond, Hatcher & Bond, for plaintiff in error.

J. G. Clift and Melton & Melton, for defendant in error.

PER CURIAM. The plaintiff's petition in substance alleges that in 1925 it sold and delivered to the defendant, under an oral contract, gas and oil well pipe and supplies in the total value of $1,481.75, for which defendant agreed to pay, and did thereafter pay thereon the sum of $500 in cash, leaving a balance of $981.75 due the plaintiff, no part of which has been paid, and prays for judgment against the defendant for said amount, and the foreclosure of a material-man's lien upon a certain gas well and real estate described in the petition.

The defendant in his answer and cross-petition admits the purchase of the pipe as alleged, and that there is a balance of $852.15 thereof that has never been paid, and as a defense contends that in March of said year he was planning the drilling of five gas wells, and entered into an oral contract with the plaintiff by which it was to furnish him second-hand or used casing, as good as new, such as he might need for said wells; and deliver the same to him a sufficient time before it was to be used, for him to inspect the same and cull out such thereof as he could not use, and thereafter deliver to him a sufficient amount of 8¼-inch second-hand casing · for two wells known as wells Nos. 5 and 6, Farwell lease; that he inspected the same and found it in good condition and accepted it. That afterwards and before he was ready to use it, the plaintiff borrowed a portion thereof and agreed to return to him before he would need it a like quantity of good second-hand 8¼-inch casing or new pipe in place thereof. That upon said promise and guarantee of the plaintiff, he permitted the plaintiff to borrow the same, and it thereafter failed to deliver or return other pipe in its place until after the defendant had started placing the pipe still on hand in the well, and delivered it at night so defendant could not inspect the same, but was compelled to run it in the well without inspecting it, and that it was defective and not as good casing as the plaintiff borrowed and not as good as new, but was so defective that after being placed in the well a joint or joints of said casing split or cracked, and by reason thereof the well blew out. That when drilled the well produced an open flow of about 62,750,000 cubic feet of gas each 24 hours, of the reasonable market value of 10c per thousand cubic feet, and defendant was unable to control same or stop the flow of gas therefrom for 18 days. to his damage in the sum of $25,000, and in order to control said well he was compelled to expend $8,427.72, and prays judgment against plaintiff for the difference between the amount due the plaintiff and $33,427.72.

In its reply, the plaintiff denies all the allegations of this answer and cross-petition, and these allegations and denials constitute the issues in the case.

During the trial, the plaintiff conceded a credit to the defendant of $129.60 for 108 feet of pipe at $1.20 per foot, and the jury returned its verdict for the plaintiff and against the defendant for $852.15, upon which judgment was rendered by the court, together with a foreclosure of plaintiff's lien, $125 attorney's fees, and costs. In due time the defendant filed his motion for a new trial upon the grounds and for the reasons therein set forth, which motion was denied, defendant excepted, appealed by case-made, and the appeal is now before this court for review.

The record in the case is voluminous, comprising more than 600 pages of testimony and exhibits. As will be inferred from the pleadings, the chief controversies were as to the quality of certain oil well casings which the plaintiff delivered to the defendant in return for what it had borrowed from him temporarily until he should need the same, and the promises, representations, and warranties as to the quality thereof, as

well as the cause of the blowing out of the well and some differences as to just what well had been cased with the pipe so returned in place of what had been borrowed.

The defendant based his cross-petition upon the alleged breach of an express warranty on the part of the defendant. As testified to by the defendant, that warranty was made by Mr. Hanbury, of the plaintiff company, and, as he states it, was:

"And he told me then, 'I will guarantee it, I will sell you pipe as good as new and I will send it to you in plenty of time so you and your men can clean it or inspect it and any of it you don't like or don't think safe to run, just throw it out and we will take it back; and we will guarantee everything we sell you regardless of whether new or second-hand,' so then I made the deal with him to purchase enough pipe for five wells."

Mrs. Lorena McCalister, then secretary for the defendant, testified to some matters tending to corroborate the defendant's testimony. As to the borrowed pipe, she further testified that Mr. Hanbury told her at the time he borrowed it, that "he wanted to borrow it, and that he would furnish as good pipe when we were ready to use it," and "said he would have just as good pipe for Mr. Nichlos when he was ready for it." As to this borrowed pipe the defendant testified that Mr. Hanbury called up, "he wanted to borrow that pipe. He guaranteed he would return it in plenty of time. * * * That he would bring it back in plenty of time and guarantee it would be just as good pipe, but if he didn't get as good pipe he would furnish us new pipe in place of it."

As to whether any guarantee was made as to the original purchase, Mr. Hanbury, who sold the pipe to defendant, in his testimony on this point, said:

"Mr. Nichlos * * * told me that he would like to have good second-hand pipe. I told him 'That is the only kind I handle'; I managed to give him the right kind of second-hand pipe that he could use. I don't think I made any guarantee like that (to be as good as new) because we can't guarantee second-hand pipe. It was not as good as new. I don't really remember the exact terms we used: we agreed to furnish him the proper pipe he could use out there, but we didn't denominate any kind, or all that stuff. Did you guarantee any part of the second-hand pipe to be as good as new? I did not. Was it as good as new? It was not."

"Q. Now, this pipe that you borrowed from Mr. Nichlos, of course you had tested it? A. Yes. Q. And then the pipe that you returned, of course, you tested that? A. Yes, sir. Q. And you had agreed to give Mr. Nichlos good second-hand standard pipe? A. We were very careful in testing that pipe we sent to Mr. Nichlos. Yes, sir."

We have examined the record. The examination and cross-examination of the witnesses by counsel were lengthy, searching, and exhaustive. Upon almost every material point the evidence was in hopeless conflict. The foregoing will show how conflicting was that which came from the only witnesses testifying to one of the most important matters involved in the issues.

Similar conflicts appear throughout the evidence. There was a disagreement as to the very number of the well in which the casing which had been borrowed and afterwards returned was used. If it was well No. 5 that blew up, then the casing used in that was good casing of which the defendant had no complaint. There was conflict as to when the borrowed casing was returned, whether in daylight, in the early part of the night, or after midnight. There was conflict as to the reasonable possibility of inspecting the returned casing for defects as it was being run in the well. There was conflict as to whether it would have been safe to agitate the thousand feet of casing which had been inspected and accepted by the defendant and run in the well, while delaying a sufficient time for the inspection of the pipe which was returned as the well was being cased up. There was conflict as to the cause of the blowing out of the well,—whether by a split in the lap of the welded casing, or a cross-threading of the joints in running the casing, or by a crack in a collar, or just because of the natural forces exerted through rock pressure of 880 pounds and the great volume of gas which came from the well. Just what caused the disaster is a matter of inference and conjecture, of assumption and speculation, of opinion advancing from unknown premises to uncertain decisions, where knowledge was impossible and probabilities were doubtful, and the wisest and the best of men could reasonably arrive at different and conflicting judgments and conclusions. Various witnesses gave reasons for their opinions as to these matters; but unless the jury adopted the defendant's theory as to the proximate cause of the blowout, that the plaintiff had expressly guaranteed the pipe to be good, that it was not good and not returned at a time it could

be inspected by defendant, he could not recover damages.

With all these conflicts in the evidence, it was the province of the jury to determine the credibility of the witnesses and the weight and value of their testimony, and if properly instructed by the court as to the law applicable under the issues to be determined and the evidence in support thereof, its conclusions and determination of such conflicts in the testimony as voiced in its verdict will not be disturbed on appeal.

There is abundant evidence by the defendant, if believed by the jury, to establish his case as set forth in his cross-petition. There is likewise abundant evidence by the plaintiff, if believed by the jury, to establish his defense thereto. The rule is well established that questions of fact, such as the one here, are exclusively for the jury; and where a question of fact is submitted to the jury under proper instructions, the finding thereon will not be disturbed, if there is any competent evidence which reasonably tends to support the same. Amons v. Howard, 111 Okla. 195, 239 P. 217; Robb v. Moffett, 112 Okla. 20, 239 P. 674; Greenback v. Wood, 138 Okla. 53, 280 P. 464; Dixie Motor Coach Corp. v. Johnson, 155 Okla. 240, 9 P. (2d) 5. Upon this point the verdict of the jury is conclusive.

The defendant complains of instruction No. 5, which reads as follows:

"You are further instructed, gentlemen, that in this case there is no implied warranty that the casing furnished defendant by the plaintiff was in good condition, or as good as that the plaintiff borrowed of the defendant, but if the defendant recovers at all, it must be upon a specific contract with the plaintiff."

We see no error in the giving of this instruction. The defendant's cross-petition pleads an express warranty, and the usual rule is that one who asserts such a warranty must establish the same by a preponderance of the evidence. While there are exceptions to the rule, the exceptions themselves arise because of the unusual and peculiar nature of the article sold, such as complicated machines, motor trucks, and complex and intricate apparatus, but, as to other things which are simple in construction and in which any defects would be obvious and apparent, the usual rule obtains. The rule is that an express warranty in a contract of sale excludes any implied warranty; and the defendant having in his cross-petition and his evidence proceeded upon the theory of an express warranty, cannot, after having proceeded upon that theory in pleading and evidence, shift his ground and urge an implied warranty as to the same matters. There was no error in this instruction.

"An express warranty will exclude an implied warranty on the same or closely related subject. Thus an express warranty of quality will exclude an implied warranty of fitness for the purpose intended." 35 Cyc. 392.

"Ordinarily no warranty will be implied where there is an express warranty relating to the same matter." 24 R. C. L. 178.

"An express warranty in a contract of sale usually excludes an implied warranty." Olson v. Sullivan, 109 Okla. 293, 234 P. 634.

In Sherman v. Sheffield Cast Iron & Foundry Co., 50 Okla. 109, 150 P. 1062, the principle involved is similar to the principle involved here.

Complaint is also made of instruction No. 4, which was as follows:

"You are further instructed, gentlemen, that should you fail to find and believe from the evidence that the plaintiff at the time he borrowed the 8¼-inch casing from the defendant, that he guaranteed he would return as good casing as he received or replace the same with new, then the defendant cannot recover on his cross-petition filed herein, and the law would be for the plaintiff and you should so find."

This likewise was a controverted issue; and even though standing alone the instruction might be subject to some criticism, yet this was only one instruction in a charge which contained nine several instructions upon various issues and theories of the case. The charge must be viewed as a whole, and the trial court so instructed the jury. When so viewed the foregoing, which covers one phase of the case, is not objectionable. Construed in connection with the other instructions, it could not be misleading, nor be reasonably construed as urged by the defendant. If plaintiff did not guarantee to return good casing, he cannot be penalized for failing to do something he did not undertake to do, and this is substantially what the court tells the jury here. We find no error in the giving of this instruction.

The defendant further complains that the court erred in giving instruction No. 6, which is as follows:

"The court instructs the jury that if you should find and believe from the evidence that well No. 6, or the West well, as referred to in the evidence, was the first well

drilled by the defendant, then under the law the defendant cannot recover any damage against the plaintiff, by reason of the fact that the casing that was placed in the first well drilled was inspected and accepted by the defendant."

There was no conflict in the evidence that the casing used in the first well was all right and that no trouble was had with it. Whether the first well drilled was No. 5 or No. 6 on the Farwell lease was a matter of conflict in the evidence; and the foregoing instruction covered that phase of the case. If there was any warranty, whether express or implied as to the casing used in the first well drilled, that was immaterial, since no one claimed the well first drilled was the one that blew out. There was no error in the giving of this instruction.

Complaint is also made of instruction No. 8, which is as follows:

"You are further instructed, gentlemen, that should you find and believe from the evidence that there was a contract between the plaintiff and the defendant by the terms of which the plaintiff was to return to the defendant in lieu of the pipe borrowed from him, as good casing as that he had borrowed, or new pipe, still if you further find and believe from the evidence that the plaintiff returned to the defendant other pipe in lieu of that borrowed a sufficient time prior to being used, for the defendant with the exercise of reasonable diligence to inspect said casing, and you further find and believe from the evidence that the defendant failed to examine and inspect the same, but placed the same in the well without inspection, the law would be for the plaintiff and you should so find."

In support of his objections to this instruction, the defendant proceeds upon the proposition that where there is a warranty no inspection is necessary. That might be true, if that was all there were to the agreement between these parties. But the evidence shows beyond all question that both agreed and understood that there would be an inspection of the casing by Mr. Nichlos before it was run into the well, and they both acted upon such construction of the agreement. Both were interested in protecting the wells against the high pressure and the great volume of gas the pipe must withstand, and both were to inspect and test the pipe before it went into the wells. Even the defendant nowhere asserts that an inspection was not contemplated; for upon this phase of the case his complaint is that the plaintiff delayed so long about returning the borrowed pipe that he had no opportun-

ity to inspect it. His own testimony shows that he left the well and the field the day or night the pipe was run into the well, and went to Chickasha and retired. "I was so tired and sleepy and all-in I didn't go back that night." "The boys took it for granted the pipe was all right and they just went on and used it." But the casing crew did inspect and oil the threads of the joints, but did not test by hammer or other device the joints as they, one by one, were lowered into the well, as there was some evidence they could have done quite handily. As to this matter, too, there was a clear conflict in the evidence, and this conflict called for the giving of the foregoing instruction. Under all the evidence, the defendant not only had the right, but it was his duty, to inspect the pipe and test it out before using it in the well, unless the plaintiff by unreasonable delay in delivering it back prevented. These were questions for the jury to determine, and the court committed no error in calling its attention to the same in this instruction.

We have fully examined the record in this case, the instructions of the court and the proceedings upon the trial. The instructions as a whole are clear and easily understood and state correctly the law applicable to the various phases of the testimony appearing for determination. The case was fairly tried and every opportunity afforded for counsel to present any proper evidence in support of their theories. No material errors affecting the substantial rights of the parties are apparent. The verdict of the jury embodies the result of its deliberations upon the evidence presented for its consideration. Under the well-established rules in such cases, the verdict is final and conclusive and this court has neither the power nor the disposition to disturb its findings.

Other alleged errors set forth in his motion for a new trial, but not discussed in his brief, are assigned by the defendant. Under the rules they are deemed to be waived, but nevertheless we have given them full and careful consideration, and are of the opinion that none of such matters are of a character prejudicial to the substantial rights of the defendant. No evidence admitted over his objections was of consequence or importance in determining the result, or of a nature to mislead the jury, or to prejudice his rights at any time. The instructions of the court fully, fairly, and adequately presented to the jury the various issues and theories relied upon by the parties to the action as revealed by the evi-

dence. The verdict of the jury settled all the conflicts therein against the contentions of the defendant, and is abundantly supported by the testimony.

There was no error in overruling the defendant's motion for a new trial. The judgment of the trial court is affirmed.

The Supreme Court acknowledges the aid of District Judge Freeman E. Miller, who assisted in the preparation of this opinion. The District Judge's analysis of law and facts was assigned to a Justice of this court for examination and report. Thereafter the opinion, as modified, was adopted by the court.